Carroll *vs.* Bowie.—1848.

The defendants pleaded to the plaintiff's declaration, and he rejoined, assigning breaches of the condition of the bond declared on. The defendants then demurred generally, in which the plaintiff joined. The county court adjudged the replication of the plaintiff, good and sufficient in law to maintain the action, from which the defendants appealed to this court.

The cause was argued before Dorsey, C. J., Martin and Frick, J.

By Reeder for the appellants.

----

Michael B. Carroll, Executor of W. B. C. Worthington, *vs.* Robert W. Bowie.—*December* 1848.

Upon an appeal to the December term of this court 1847, errors were assigned, and a rule argument entered at June term 1848, the next succeeding term. The cause was set down for trial at December term 1848, when, at the call of the cause, the counsel of the appellee appeared, and suggested the death of his client, in January 1848. Held, that the cause did not abate.

At common law, if the *plaintiff in error* dies after errors assigned, it does not abate the writ; and a writ of error does in no case abate by the death of the *defendant in error*, whether it happen before or after errors assigned.

The act of 1806, ch. 90, sec. 11, has no application to the case of the death of the defendant in error. It relates only to deaths *after* rule argument laid.

The act of 1815, ch. 149, sec. 6, declares, that in all appeals or writs of error, the same shall not abate by the death of either party, if the proper person necessary to be made party shall, at the first or second term succeeding the death, appear for the purpose of prosecuting or defending the same.

Carroll *vs.* Bowie.—1848.

But it is not to be inferred, that the heir, &c., or other proper person to be made a party, if a defendant, may elect to suffer a cause to abate, and so deprive the other party of the fruits of his judgment. Such a construction of the act of 1815, would constructively repeal the act of 1806.

The acts of 1806, ch. 90, sec. 11, and 1845, ch. 149, sec. 6, should be construed together; the former is confined to cases of death after rule argument, which points to the third term of the court, while the latter designs to extend the death to all prior stages in the cause, if the party proper to be made accepts the privilege conferred by that act.

The object of the act of 1815, was to prevent the abatement of appeals in certain cases, and intended that the party interested in sustaining the judgment of the court below, should have the privilege of appearing to prosecute or defend here.

The act of 1815, is to be confined to such cases as did abate by the death of the party before that act was passed.

The case of *Owings vs. Owings*, 3 *Gill & John.*, 1, explained and confirmed.

At common law, where one joint obligor has satisfied the bond, his remedy against his co-obligors is in *assumpsit* for contribution.

In such a case, payment by one, works a satisfaction of the bond; and the only remedy is, to recover back from *the other sureties* in the bond, their proportion of the payment; or, from the principal the whole amount.

The possession by an obligor of a bond, a surety in the bond, creates a presumption in law that it has been paid.

By the 7th sec. of the act of 1763, ch. 23, where any person is bound in a bond or obligation, which shall be unpaid by the principal debtor, and the money due be paid or tendered by the surety, the obligee shall assign such bond to the surety, and he may, by virtue of the assignment, have an action in his own name against the principal debtor, but this section gives no remedy against a co-surety.

Neither does the 9th section of that act, give any remedy to one co-surety against another. It does no more than to supersede the common law, and give to the assignee, as the holder of a bond of third parties, the right to sue in his own name, the principal debtor; not to affect pre-existing rules between co-sureties.

If a principal obligor, and a surety, be sued on the bond by a co-surety, who claims as assignee from the obligee, he can recover but one-half from the co-security, while he claims the whole sum from the obligor. Such an incongruity cannot subsist at law.

The act of 1829, ch. 51, which authorises an assignee of a bond to sue in his own name, does not apply to the relation of co-sureties. It was not intended any more than the act of 1763, to affect questions which depend upon principles of contribution.

APPEAL from *Prince George's* county court.

This was an action of *debt,* brought on the 21st March 1846, by the appellant against the appellee, on the joint and several

bond of *William B. Chew, W. B. C. Worthington,* and Ro-
bert *W. Bowie,* with condition, that *W. B. Chew* would pay
*Edward Eversfield* $1000, with interest, on or before 1st June
1843.   The bond was assigned, under seal, by *E. E.* to *W. B.
C. W.,* one of the securities, for value of him received, on the
14th August 1844.   The declaration of the plaintiff set forth
the bond and condition, the assignment by *E. E.* to his testator
in writing, before the payment of the $1000; the delivery of
the bond to such testator, of which assignment and delivery
the defendant had notice, and so became bound to pay the
sum demanded in the nar, $500, and non-payment.

The defendant demurred generally to the declaration, in
which the plaintiff joined.   The county court gave judgment
for the defendant, when the plaintiff prosecuted this appeal.

The cause was decided in the county court at November
term 1847, and the appeal taken to December term 1847 of
this court.   In this court, on the 9th December 1848, the
death of the appellee was suggested, as having occurred in the
month of January 1848, and before the cause was under "rule
argument," for which reason it was alleged that the appeal
had abated.

The cause was argued before DORSEY, C. J., SPENCE,
MARTIN and FRICK, J.

By T. F. BOWIE for the appellant, and
By W. H. TUCK for the appellee.

FRICK, J., delivered the opinion of this court.

In this case, the appellant's testator, *Walter B. C. Worth-
ington,* and *Robert W. Bowie,* the appellee, became sureties
for *Wm. B. Chew,* in a bond to *Edward Eversfield,* condi-
tioned for the payment of $1000.   *Worthington,* afterwards,
purchased or paid off the bond, and took from *Eversfield* an
assignment thereof, in the following words:

"For value received, I hereby assign the above note to *W.
B. C. Worthington,* one of the securities aforesaid, his heirs
and assigns.   Witness my hand and seal, this fourteenth day
of August 1844."

The writ was issued on the 21st day of March 1846, in the name of *Michael B. Carroll,* executor of *W. B. C. Worthington,* against *R. W. Bowie* alone. The writ counts in debt on the bond for $2000. The declaration sets out the bond, the condition and the assignment, and demands $500 of the defendant, being one-half the debt originally due. The defendant entered a general demurrer. The plaintiff joined in demurrer, and the court below gave judgment for defendant.

It is contended before us, by the counsel for the appellant, that the court below erred in sustaining the demurrer:—because the declaration sets forth a good cause of action;—and the bond declared upon being a joint and several bond, the plaintiff's testator, although one of the co-obligors, as surety for the principal obligor, had a right to take an assignment of said bond from the obligee, and such assignment gave him the right of action upon the bond, against his co-surety, in his own name.

Before proceeding to announce our opinion on the validity of these objections to the judgment below, a preliminary question arises upon a suggestion at bar, of the death of the appellee upon the record.

The appeal was brought to the December term of this court 1847. After errors assigned, and a "rule argument" entered at June term 1848, the case was set down for trial, at this December term 1848. At the call of the case for trial, the counsel on the record for the appellee voluntarily comes into court, and makes suggestion in writing of the death of the appellee, in January 1848. Thus, then, the death occurred before errors assigned, and is suggested after the rule argument, and is precisely within the terms of *Roach vs. Johnson,* reported in 2 *H. & J.,* 37, *(note a,)* where the court decided, that a writ of error or appeal, did not abate by the death of either party, if the case was standing under rule argument before the death is suggested. And this is in strict conformity to the common law, as laid down in *Tidd's Practice,* 1163, *9th ed.:* "If a plaintiff in error dies, before errors assigned, *the writ* abates, and the defendant may thereupon sue out a *scire facias, quare executionem non,* to revive the judgment against the executors or administrators of plaintiff in error."

"If plaintiff in error dies, after error assigned, it does not abate the writ."

"And a writ of error does in no case abate by the death of the defendant in error, whether it happen before, or after error assigned." This doctrine is recognised in 2 *Williams' Ex'trs,* 1234, and in *Green vs. Watkins,* 6 *Wheat.,* 262.

But it is said, the acts of Assembly, of 1806, ch. 90, sec. 11, and 1815, ch. 149, sec. 6, qualify and control this doctrine, and, if so, this court is bound by them. To the case under consideration, the former act has no application, the words of that act being, "in case one of the parties shall *die, after* rule argument, the cause shall not abate," referring to the time of the death, and not the date of the suggestion. And here, the party having died *before* the case was under the rule, it is, of course, not within its provisions. The act of 1815, has a more direct application to the case before us, if it can be construed to come within the scope and intention of that act. It provides, "that in all appeals or writs of error depending in the Court of Appeals, the same shall not abate by the death of either party, if the proper person necessary to be made party, shall, at the first or second term succeeding the death, appear for the purpose of prosecuting or defending the same."

Hence it is inferred, that the heir, devisee, executor, administrator, or other proper person, to be made the party, if a defendant may elect to suffer the cause to abate, to the detriment of the other party, and in direct violation of every principle of justice, deprive him of the fruits of a judgment righteously obtained in the court below.

At first view, the peculiar texture of the paragraph, would seem to warrant the construction contended for, and thus, in the event of the death of a party, operate to defeat the appeal in every case, where his representatives may find it their interest to do so, and that *at any and every stage of the appeal.* If constructively under this act, every case abates where the proper representative declines to appear, and has the first and second term after the death to appear or not at his option, does it not constructively also repeal the act of 1806? That act provides, the case shall not abate, if the party *die after* rule argument;

and yet, by the act of 1815, die when he may, the option extends to the second term succeeding the death, and that may happen, in the course of things, as well *after* as before the rule argument. This conclusion from the premises is clear; as clear as it is to the court, that if it was intended to repeal the act of 1806, it would have been done in express terms. On the contrary, it is a more just and reasonable construction to suppose, the legislature intended both acts to stand together; the act of 1806, being confined only to cases of death after rule argument, (which points to the third term of the court,) while the act of 1815, designs to extend it to all the prior stages in the cause, if the party accepts the privilege conferred by the act.

Independent of that act, it is admitted, the case does not abate, and if the present object of the appellee is to be attained under the act, it must be constructively. In sustaining such construction, we need not look far before us, to perceive the manifest injustice the rule must work upon the suitors in this court. But such legislation, by implication, cannot be supposed to have been in the view of the legislature. Whatever the form of construction and phraseology of the law of 1815, nothing more could have been intended, than that the party interested in sustaining the judgment below, should have the privilege of appearing to prosecute or defend it here, to prevent the abatement of the suit. Not, that by declining to appear, he shall have the advantage of defeating the object of the appeal.

We have seen, that at common law, in certain cases, the suit did abate by the death of a party. In other cases it did not abate, as in the case before us. The object of the act of 1815, therefore, was manifestly on its face, conceived to prevent abatements. It is no forced construction to say, it was a provision for the first class of cases, such as did abate, and not designed to effect an abatement of such, as did not abate before the act. They cannot have intended to say this, and no conceivable reason in policy and justice can be urged in support of it. No object can be imagined for legislating upon any other class of cases, than such as were before unprovided for;

that is, such as would have abated at the time the act was passed. The whole scope of the enactment, from its obvious import, when rightly construed, was to *prevent* the abatement of suits, not to legislate them out of court constructively.

In the absence of all positive averment, we cannot assume, that, by implication, the legislature designed to legalize such obvious injustice, and to convert what is ostensibly a boon and a privilege, into an instrument of wrong and oppression.

The court are the more encouraged in sustaining this view of the act of 1815, because it may be made to stand consistent with the act of 1806. Whereas, by the construction contended for, that, by implication, every suit in this court abates by the death of a party, if the representative declines to come in at the first or second term after the death, we decide, in the same implication, the repeal of the act of 1806, and a repeal of the decision in *Roach vs. Johnson*, which it is the purpose of this court to sustain, conceiving, by the views here taken, that that case and both acts of Assembly may stand consistently together.

In coming to this conclusion, upon the construction of the acts before us, it may be proper to remark, that we have not overlooked the case of *Owings vs. Owings*, in 3 *G. & J.*, 1, where the court would seem to have given a different construction to the sixth section of the act of 1815. Where that section provides, that no action shall abate, if the heir, executor, &c., shall appear; the court there say, that "the necessary corollary is, that the appeal or writ of error will in such case abate, if the heir, executor, &c., shall not appear." This, however, as before argued, must be construed to mean, such cases as *did abate by the death of the party before the provisions of the act*, and to this class of cases, the whole act must be taken to refer. At common law, if the plaintiff in error died before errors assigned, the writ abated, and for this case the legislature provided in the fifth section of 1815. And to cover all other possible cases where the appeal would abate by a death, the subsequent section was added, to enable the party to sustain the case in the Court of Appeals; that is, *such a case as necessarily abated before the interposition of the act*. And in all such cases, if any remain unprovided for, it is still the "neces-

sary corollary," that the appeal will abate, if the party interested fails to avail himself of the privilege conferred by the act. And such must be construed to be the meaning of the court in the case of *Owings vs. Owings*, where the party actually died *before appeal taken;* and the language of the act being, "in all cases *depending* in the Court of Appeals," the construction of the acts of Assembly was there out of the question, and the case abated at common law.

We now proceed to the right of the party to recover in this form of action. At common law it is admitted, that where one joint obligor has satisfied the bond, his remedy against his co-obligors is in assumpsit for contribution. For, in such case, the payment by one, works a satisfaction of the bond, and the only remedy is, to recover back from the other sureties in the bond their proportion of the payment, or from the principal the whole amount. The very action of the co-obligor proceeds upon the *concessum*, that he has paid the bond. His possession, out of the hands of the obligee, is a presumption in law, that it has been paid. *2nd Greenleaf, sec. 527.* And the action in this case, and the declaration, proceed upon the averment, that the bond was assigned by the obligee to the appellant, and, of course, that he has paid it, and being so paid by him as an obligor, it is extinguished forever as an obligation, and all right of action upon it at common law is gone.

Such being then the position at common law, is the case of the appellant aided by the act of 1763, ch. 23, which he has invoked to the support of the action in this form? By the 7th section of that act, where any person is bound in a bond or obligation, which shall be unpaid by the principal debtor, and the money be paid or tendered by the surety, the obligee shall be bound to assign such bond to the surety, and he may, by virtue of the assignment, have an action in his own name, against the principal debtor, notwithstanding any law or usage to the contrary. Whatever right this section may furnish against *Chew*, the principal debtor, it so far gives no remedy to the appellant against his co-surety, *Bowie.*

And the 9th section, on which the appellant principally relies, is equally unavailing to sustain this action. For, although "upon all bonds or obligations under seal, that shall be assigned under seal, the assignee may maintain an action in his own name against the *obligor or obligors,*" it would be in direct violation of the policy and object of the act, to attach or extend the right here given, to a *surety* against his co-obligors. To them, he stands in an attitude entirely different from his relations to the principal debtor, against whom, where the surety pays the debt, the law provides the mode of redress in the 7th section. If, as a *surety*, he may, under the 9th section, sue all the obligors in the bond, the principal obligor is necessarily one among them, and the whole 7th section then becomes entirely nugatory, and without design or meaning. For it is as fully expressed in the first clause of the 9th section, giving the right to sue "the obligor or obligors," as if the party, "principal debtor, had been there introduced in so many words, and, consequently, the 7th section, for all that it contemplates, might as well be expunged from the act. We cannot concede, therefore, that this 9th section designs any thing more than to supersede the common law, and give to the assignee, as the holder of a bond of third parties, the right to sue *in his own name;* not to affect the pre-existing rules between the surety and his co-sureties, which would be productive of perplexity and confusion. The latter clause of the section is also additional evidence of this design, where further provision is made for the recovery of the debt from the obligee who assigns, but a *surety in the bond* is excluded from the benefit of it, and, indeed, from the whole tenor of the act, is precluded from suing on a bond in which he is a party, except against the principal debtor, under the terms of the 7th section.

Would not any other construction of this act of 1763, involve the inconsistency, that while the co-obligor has from the obligee an assignment of the whole debt, he has, in law, but a claim for one-half, and yet, under the act, must sue for the whole sum in the bond? He has on the face of the assignment the whole debt, and can only make it available against his co-surety for the half, while his right to the whole against

the principal debtor is complete. Suppose, then, the principal and surety both sued, could he recover more than one-half against the surety? and yet his judgment against the principal, must be for the whole. Can such an incongruity subsist in law? and yet it must result from the principle here contended for.

The act of 1829, ch. 51, which entitles an equitable assignee to sue in his own name, which has also been cited in support of this form of action, cannot, in this view of the court, sustain the appellant. If it is wrongfully conceived under the act of 1763, ch. 23, it must be equally so under this act of 1829. The objections here urged, apply equally to both, and whatever rights or remedies were intended by them to be conferred upon assignees, which the common law did not confer, it is obvious, they were not designed to extend to the case of a *surety*, who pays the bond of the principal, and seeks contribution from his co-surety. The case is not within the provisions of either act, and the appellant must seek his remedy in another form of action.

This view of the case, renders it, of course, unnecessary to examine or express an opinion upon the alleged defect in the declaration, inasmuch as if the declaration were free from objection, still, in the judgment of this court, the action is misconceived, and the judgment below on the demurrer must be affirmed.

JUDGMENT AFFIRMED.